**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and** | ) | |
| **PEOPLE OF THE VIRGIN ISLANDS,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal Action No. 2011-017** |
| | ) | |
| **LEVAR POGSON,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| ———————————————————— | ) | |

**Attorneys:**
**Alphonso Andrews, Esq.,**
St. Croix, U.S.V.I.
  *For the United States and the Virgin Islands*

**Kye Walker, Esq.,**
St. Croix, U.S.V.I.
  *For the Defendant Levar Pogson*

<u>**MEMORANDUM OPINION**</u>

**Lewis, District Judge**

  THIS MATTER comes before the Court on a Motion filed by Defendant Levar Pogson ("Defendant") to suppress the statements he made to Sergeant Dino Herbert of the Virgin Islands Police Department on June 18, 2011. An evidentiary hearing was held on December 22-23, 2011. For the reasons that follow, the Court will deny Defendant's Motion.

# I. BACKGROUND[1]

On February 25, 2011, members of the Virgin Islands Police Department, including Sergeant Dino Herbert and Officer Richard Matthews, executed a search warrant at Apartment 195, Building 31, of the John F. Kennedy Housing Community in St. Croix, United States Virgin Islands. In the process of executing the warrant, officers encountered four people, including Defendant, in proximity to a firearm and illegal drugs. After conducting a protective sweep of the adjoining rooms, the officers found an additional person, substantial sums of U.S. currency, large quantities of marijuana, crack cocaine, cocaine, an additional firearm with ammunition, a digital scale and several small bags of marijuana. Aff. of Sergeant Dino Herbert at 1-2 (Dkt. No. 43-2). The five individuals, including Defendant, were arrested at Apartment 195. (12/22 Tr. at 143:11-12) (Testimony of Officer Richard Matthews).

After Defendant's arrest at the apartment, Officer Matthews advised Defendant of his rights at the Rainbow Police Station. (12/22 Tr. at 143:12-14). Officer Matthews provided Defendant with an "Advise of Rights" form and read a copy of the form aloud while Defendant read along silently. (12/22 Tr. at 143:17-23). When asked by Officer Matthews if he understood his rights, Defendant said yes. (12/22 Tr. at 144:2-6). Defendant then signed the Advise of Rights form, representing, in writing, that he understood his rights. (Govt. Ex. 3H). Defendant told Officer Matthews that he did not

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing and affidavits and documents accompanying the parties' filings relating to the Suppression Motion. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

want to make a statement, (12/22 Tr. at 145:3), and he declined to sign the portion of the Advise of Rights form that would indicate a waiver of his rights, (Govt. Ex. 3H).

An Information was filed against Defendant in the Superior Court of the Virgin Islands on March 14, 2011 for the charges relating to the February 25, 2011 arrest. (Govt. Ex. 1A). Attorney Anna Washburn was appointed to represent Defendant in that matter. (12/22 Tr. at 250:14-15) (Testimony of Attorney Anna Washburn).

On March 15, 2011, the day after the Information was filed against Defendant, Sergeant Herbert testified about the events of the February 25, 2011 arrest before a federal grand jury. (12/22 Tr. at 182:14) (Testimony of Sergeant Herbert). On March 29, 2011, an Information was filed in the District Court of the Virgin Islands against two other men arrested on February 25, 2011, Dwayne Woodrup and Roy Henry. (Govt. Ex. 2A). An Information was not filed against Defendant in District Court because there was not enough substantiated evidence against Defendant. (12/22 Tr. at 185:11-17). The case against Defendant in the Superior Court was subsequently dismissed without prejudice on May 27, 2011, because the Government was unable to sustain its burden of proof at the time. (Govt. Exh. 1D).[2] Defendant was released from custody on June 1, 2011. (Govt. Ex. 3I).

On July 29, 2011, Defendant appeared in the office of Attorney Eszart A. Wynter, who was not his counsel, but who was representing Dwayne Woodrup against the charges brought against Woodrup in District Court. (12/22 Tr. at 37:22) (Testimony of Eszart

_____

[2] The Motion to Dismiss without Prejudice, filed on May 21, 2011 states: "The People cannot sustain its burden of proof at this time in this matter." (Govt. Ex. 1D). The Order of Dismissal is dated May 26, 2011, (Govt. Ex. 1E), but according to the testimony of Attorney Venetia Valesquez, Clerk of the Superior Court of the Virgin Islands, the Order was entered on May 27, 2011, (12/22 Tr. at 21:19-21) (Testimony of Attorney Venetia Valesquez).

Wynter, Jr.); (Govt. Ex. 3F). At Attorney Wynter's office, Defendant executed an affidavit, which contained potentially exculpatory information for Dwayne Woodrup and potentially inculpatory information regarding Defendant. (Govt. Ex. 3F).[3] At some point prior to July 29, 2011, the office of Attorney Wynter had received a fax that included information that exculpated Dwayne Woodrup and that bore Defendant's name. (12/22 Tr. at 39:25, 40:1-7) (Testimony of Wynter, Jr.).[4] The receipt of this fax precipitated Attorney Wynter's involvement with Defendant and explains why Defendant appeared in Attorney Wynter's office on July 29, 2011 to execute an affidavit.

On June 18, 2011, Sergeant Herbert interviewed Defendant.[5] Sergeant Herbert testified that he spoke with Defendant because Assistant United States Attorney Alphonso Andrews provided Sergeant Herbert with the document that had been faxed to the office of Attorney Wynter. Sergeant Herbert believed that Attorney Wynter provided the document to Attorney Andrews. (12/22 Tr. at 184:24-185:2) (Testimony of Sergeant Herbert) ("[The documents came into my possession when Attorney Andrews came to me and presented them to me and indicated to me that he basically received those documents from Attorney Wynter."). Sergeant Herbert interviewed Defendant to verify

---

[3] In the Affidavit, Defendant represented that on February 25, 2011, Dwayne Woodrup had retired to the bedroom of the apartment before Defendant and Mario Felix, another individual arrested that evening, brought marijuana and a gun into the apartment.

[4] The exact date of the receipt of the fax was not conclusively established by testimonial evidence at the evidentiary hearing, but the transmission information on the fax bore a date of May 31, 2011. In addition, while the document bore Defendant's name, neither the author nor sender of the fax was established.

[5] Sergeant Herbert first attempted to interview Defendant approximately two weeks before the June 18, 2011 interview; however, Defendant did not appear for the first scheduled interview. (12/22 Tr. at 185:11).

the information in the document, because the document contained information that could exculpate Dwayne Woodrup and Sergeant Herbert "[didn't] want to put the wrong person in jail." (12/22 Tr. at 185:11).

Sergeant Herbert's interview of Defendant on June 18, 2011 occurred at the police station.[6] Prior to the interview, Defendant was given a copy of an Advice of Rights form that he read silently while Sergeant Herbert read Defendant's rights aloud. (12/22 Tr. at 200:23-201:3). Defendant signed the portion of the document that attested to his understanding of his rights as well as the portion that reflected his waiver of those rights. (Govt. Ex. 3H); (12/22 Tr. at 201:15-18) ("[Defendant] signed both portions . . . The initial part of the Advise of Rights are his rights, and then the additional part is the waiver."). Defendant did not hesitate before signing the Advise of Rights form or in providing statements to Sergeant Herbert. (12/22 Tr. at 201:20-23). Defendant answered questions regarding the document faxed to Attorney Wynter and the events surrounding the February 25, 2011 arrest. Sergeant Herbert reduced Defendant's narrative statement to writing, and Defendant signed the written statement. (Govt. Ex. 3D). Defendant's statement was taken without the presence of Attorney Washburn, the attorney appointed to represent Defendant for the charges that had been brought in Superior Court. *See* Def.'s Mot. at 5.

On September 1, 2011, Defendant was indicted in the District Court on charges of possession of crack cocaine with intent to distribute, possession of cocaine with intent to distribute, possession of marijuana with intent to distribute, possession of a firearm

---

[6] Facts were not established at the evidentiary hearing as to whether Sergeant Herbert transported Defendant to the police station in his police car or whether Defendant arrived independently. Sergeant Herbert testified that he could not remember whether he drove Defendant to the police station. (12/22 Tr. at 199:23-24).

during a drug trafficking crime, possession of a firearm with an obliterated serial number, and unauthorized possession of a firearm. Defendant seeks the suppression of all written and oral statements made during his interview with Sergeant Herbert on June 18, 2011, on the grounds that Defendant's Fifth and Sixth Amendment rights were violated.

## II. ANALYSIS

### A. The Fifth Amendment

Defendant claims that his Fifth Amendment right to counsel was violated when he was subject to a custodial interview by Sergeant Herbert on June 18, 2011, after invoking his right to counsel during his arrest on February 25, 2011. Specifically, Defendant argues that under *Edwards v. Arizona*, (451 U.S. 477 (1981), "an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him . . ." *Id.* at 484. Thus, according to Defendant, Sergeant Herbert's June 18, 2011 interview, without counsel present, constituted an impermissible interrogation under *Edwards*. The Government responds that no Fifth Amendment violation occurred because Defendant was not in custody at the time the statements were made, rendering the protections of *Miranda* unnecessary.

The Fifth Amendment provides that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. While the Fifth Amendment does not expressly guarantee the right to an attorney, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court recognized the danger of self-incrimination inherent in custodial interrogations:

[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively appraised of his rights and the exercise of those rights must be fully honored.

*Id.* at 467 (1966). Accordingly, the Court will address whether Defendant's rights were violated under *Miranda* and its progeny.

## 1. The Custodial Nature of the June 2011 Interview

Because custodial interrogation "blurs the line between voluntary and involuntary statements," (*Dickerson v. United States*, 530 U.S. 428, 435 (2000)), the Supreme Court in *Miranda* created measures to protect the Fifth Amendment guarantee against self-incrimination in custodial contexts. *Miranda's* prophylactic requirements safeguard a suspect's constitutional rights by requiring that before questioning, a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda,* 384 U.S. at 444.

"Under the prophylactic rules announced in *Miranda v. Arizona*, a statement made by a suspect in response to custodial interrogation after he or she has elected to remain silent is inadmissible at trial." *United States v. Calisto*, 838 F.2d 711, 716 (3d Cir. 1988). However, in order to invoke *Miranda*'s exclusionary rule, the statement must have been obtained during a custodial interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980); *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980) ("Miranda warnings are designed to protect against the evils of 'custodial interrogation,' and they are not intended to unduly interfere with a proper system of law enforcement or to

hamper the police's traditional investigatory functions."). The Supreme Court has repeatedly emphasized that *Miranda* protection does not apply to non-custodial interviews because such measures are only required when "there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1997)).

To determine whether an individual is in custody, the Supreme Court requires an examination of "all of the circumstances surrounding the interrogation." *Stansbury*, 511 U.S. at 322. This includes whether a reasonable person in the position of the suspect would feel that he was free to leave. *Id*. at 325. The Supreme Court has stressed that the inquiry is an objective one, meaning the test does not consider the actual thoughts of the suspect. *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004). Instead, two objective inquiries drive the analysis as to whether a defendant is in custody:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the "ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest."

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal footnote omitted)). In evaluating the totality of the circumstances, relevant considerations have included: 1) the location of the questioning, *Maryland v. Shatzer*, 130 S. Ct. 1213, 1224 (2010); 2) the duration of the questioning, *Berkemer v. McCarty*, 468 U.S. 420, 427-38 (1984); 3) the nature of the statements made, *Oregon v. Mathiason*, 429 U.S. at 495; 4) the limitations placed on the

suspect's movements, *New York v. Quarles*, 467 U.S. 649, 655 (1984); and 5) whether the suspect was permitted to leave at the end of the questioning. *California v. Beheler*, 463 U.S. at 1122-23.

Here, "the circumstances surrounding the interrogation" (*Stansbury*, 511 U.S. at 322), did not restrict Defendant's freedom in such a way that a reasonable person would have felt that he was not at liberty to end the interview and leave the police station. Defendant was not physically restrained in any way and was allowed to leave. (12/22 Tr. at 227:24-25) (Testimony of Sergeant Herbert) ("Mr. Pogson was never in any kind of handcuffs.");[7] (12/23 Tr. at 200:13-14); (12/22 Tr. at 228:1-5) ("[Defendant] was never restrained because he was never under arrest and he was allowed to leave."). Defendant arrived at the police station on a Saturday, (12/22 Tr. at 22:5),[8] and was placed in a large

---

[7] Sergeant Herbert testified that he usually does not advise individuals of their rights in non-custodial interviews, but that he advised Defendant of his rights in this case because he recognized that Defendant might be providing incriminating information and, as a result, wanted to inform Defendant that he did not have to make a statement. (12/22 Tr. at 243:10-17).

[8] A period of time passed between Sergeant Herbert's initial request for a statement and the actual interview at the police station. Defendant's counsel argued during oral argument that, because Defendant did not appear for the first interview with Sergeant Herbert, his initial absence should be interpreted as an expression by Defendant that he did not desire to speak with Sergeant Herbert. (12/22 Tr. at 230:14-25). However, Sergeant Herbert testified that Defendant was not trying to evade the initial interview; instead, Defendant told him that he was unable to keep their first appointment. (12/22 Tr. at 230:9-10).

In view of Sergeant Herbert's representation that Defendant indicated that he was unable to keep the appointment for the first interview, and the myriad of plausible reasons for missing the appointment, the Court declines to conclude that Defendant's initial failure to meet with Sergeant Herbert is an indication of Defendant's unwillingness to speak with him. However, even if Sergeant Herbert had to persist to speak with Defendant, this alone does not indicate that the interview was custodial. Repeated attempts by the police to interview a suspect does not compel the conclusion that the ultimate interview was custodial. *See Oregon v. Mathiason,* 429 U.S. 492 (finding that when a police officer

room with a table, computer, fan and lights. (12/22 Tr. at 195:5-6); (12/22 Tr. at 206:14-16).[9] Defendant was alone with Sergeant Herbert in the room. (12/22 Tr. at 22:5).

The circumstances leading up to the interview also indicate that the statement was provided in a consensual, rather than coercive, context. When Defendant was first approached by Sergeant Herbert, Defendant told Sergeant Herbert that making a statement would be "no problem." (12/22 Tr. at 197:22-24). When asked to make a statement, Sergeant Herbert testified that Defendant "wasn't defensive or nothing," but instead responded by saying "okay," (12/22 Tr. at 199:17-19), and "I'm coming in." (12/22 Tr. at 222:17-18). Sergeant Herbert testified that "Defendant showed no indication that he never did want to talk with me." (12/22 Tr. at 229:23-24). Instead, Defendant approached the statement with a spirit of cooperation, rather than compulsion. (12/22 Tr. at 230:7-9) ("It wasn't like he was disrespectful and saying I don't want to give a statement, I don't want to talk to you . . . It wasn't like he was trying to evade me.").

When a defendant "has not been openly arrested when the statements are made, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)). Here, there is no indication from anything done or said by Sergeant Herbert that

---

unsuccessfully attempts to contact a defendant three or four times, and ultimately leaves his card at the defendant's home, then suggests to the defendant to meet in the state patrol office, the resulting interview is not custodial as a result of the repeated police efforts).

[9] Sergeant Herbert described the room in which another individual was interviewed. (12/22 Tr. at 195:5-6). He then noted that Defendant was interviewed in the same room. (12/22 Tr. at 206:14-16).

Defendant would have been prohibited from leaving. Defendant was neither physically restrained nor made to feel that he was not free to leave. Instead of constituting a coercive event, Defendant indicated his willingness to speak with Sergeant Herbert on two occasions before the interview.[10] Viewing the circumstances objectively, a reasonable person in Defendant's position would not have felt his freedom was too restrained to terminate the interview. Accordingly, the Court concludes that Defendant was not in custody when he provided statements to Sergeant Herbert on June 18, 2011.

## 2. Knowing, Intelligent, and Voluntary Waiver

Even assuming that Defendant was in custody, the Court would still conclude that Defendant's Fifth Amendment right to counsel was not violated because Defendant was advised of his *Miranda* rights and executed an effective waiver of those rights. Additionally, the interview did not contravene the mandate of *Edwards*.

The Supreme Court explained the standard for waiving the right to counsel in *Johnson v. Zerbst*, when the Court articulated that an effective waiver requires the "intentional relinquishment or abandonment of a known right or privilege." 304 U.S. 458, 464 (1938). Later Supreme Court decisions elaborated that an effective waiver of the right to counsel must be given "voluntarily, knowingly, and intelligently." *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990); *Patterson v. Illinois*, 487 U.S. 285, 292 n.4 (1988) (explaining a defendant may waive his right to counsel so long as that waiver is voluntary, knowing and intelligent); *Brewer v. Williams*, 430 U.S. 387, 402 (1977). The Government bears the burden of making this showing. *Miranda v. Arizona*, 384 U.S. at 444, 475-76 (If a suspect chooses to make a statement while in custody, the Government

---

[10] Sergeant Herbert approached Defendant about making a statement at a funeral, (12/22 Tr. at 218:6), and at Defendant's home, (12/22 Tr. at 230:5).

holds the burden of showing, as a "prerequisit[e]" to the admissibility of the statement for use in the Government's case in chief that the Defendant waived his rights "voluntarily, knowingly and intelligently."); *Dickerson v. United States*, 530 U.S. at 443-44.

Defendant argues in his papers that his lack of legal knowledge prevented him from understanding that he could be re-arrested for the charges stemming from the February 25, 2011 arrest because he did not understand that when his previous charges were dismissed without prejudice, he could be re-arrested for those charges. Def.'s Mot. at 8.[11] The Government contends that Defendant's waiver was knowing and intelligent because Defendant affirmatively acknowledged that he understood his rights, and then waived those rights, as indicated by the signed portions of the Advice of Rights section. The Government further maintains that the fact that Defendant previously invoked his right to counsel in the context of his February 25, 2011 arrest demonstrates that Defendant "fully knew what his rights were and chose to waive them on June 18, 2011." Govt. Opp. at 5.

In order for a waiver to be effective: (1) "the waiver must have been voluntary 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception,'" and (2) "the waiver 'must have been made with a full awareness

---

[11] In this regard, Defendant offered the testimony of Attorney Anna Washburn, who represented Defendant in the earlier Superior Court matter. Attorney Washburn testified that she never had the opportunity, following the dismissal of the Superior Court action, to explain to her client that a dismissal without prejudice allowed refiling of the charges. (12/22 Tr. at 254:23-255:24) (Testimony of Attorney Anna Washburn). This does not establish, however, that Defendant was actually without knowledge, especially in view of the fact that he was advised, *inter alia*, that: "Anything you say can and will be used against you in a court, or other proceedings."(Govt. Ex. 3H). Defendant's contention is also belied by the circumstances indicating a knowing waiver of his rights discussed herein.

both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Only in situations where the "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.*

Here, the Court finds that Defendant's waiver was voluntary and made with an awareness of the nature of the right abandoned and the consequences of that relinquishment. First, the circumstances of the interrogation provide no reason to believe the waiver was involuntary.[12] Defendant was neither constrained nor confined, and no evidence was presented that Defendant suffered from coercive pressures. *See United States v. Pruden,* 398 F.3d 241, 245 (3d Cir. 2005) ("The circumstances of his interrogation do not provide any reason to think that the waiver was involuntary: [Defendant] was questioned in the probation office, with nothing to indicate coercion or discomfort."). Instead, before coming to the police station, Defendant told Sergeant Herbert that it would be "okay," (12/22 Tr. at 199:17-19), and "no problem," (12/22 Tr.

---

[12] At the evidentiary hearing, the Government introduced into evidence the document faxed to Attorney Wynter, (Govt. Ex. 3C), and Defendant's Affidavit prepared at Attorney Wynter's office, (Govt. Ex. 3F). Because both of these documents contained voluntarily-provided inculpatory information as to Defendant, but exculpatory information for Defendant's friend Dwayne Woodrup, the Government argued that these documents supported the proposition that Defendant also provided voluntary statements to Sergeant Herbert. (12/22 Tr. at 203:6-14) ("I think the Court could use all of that to show that [Defendant was] . . . ready and willing to confess, which is the whole issue of voluntariness."). The Court finds persuasive Defendant's contrary argument that providing a statement to Attorney Wynter is different from providing a statement to the police, and that here, the Court is tasked with considering the circumstances surrounding the voluntariness of the June 18, 2011 *statement to the police*. Nevertheless, because other evidence shows that Defendant's statement was voluntary, the Court need not rely upon the argument by the Government regarding the Affidavit taken at Attorney Wynter's office.

at 197:22-24), to make a statement, and responded to Sergeant Herbert's request for an interview by stating "I'm coming in." (12/22 Tr. at 222:17-18).[13]

Once at the police station, Defendant was advised of his rights. No evidence or argument was presented which indicates that Sergeant Herbert intimidated or coerced Defendant into waiving his rights. Instead, Defendant was provided with a copy of the Advise of Rights form, and read it along silently while Sergeant Herbert read it aloud. (12/22 Tr. at 200:23-25). Defendant then signed the Advise of Rights section of the form, indicating he understood his rights, and the waiver section of the form, which reads as follows:

> I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kin[d] has been used against me. I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions.

(Govt. Ex. 3D). Defendant did not hesitate in signing the form or speaking with Sergeant Herbert. (12/22 Tr. at 201:20-24). After Sergeant Herbert typed Defendant's oral statements, Defendant signed the written statement. (12/22 Tr. at 206:7-8). The transcribed Narrative Statement, signed by Defendant, provides further evidence of the voluntary nature of the statements:

> Q: Were you advised of your Miranda rights by me Sgt. Dino Herbert?
> A: Yes
> Q: Do you understand your rights as I read them to you?
> A: Yes
> Q: Are you willing to make a statement?
> A: Am going to answer the questions you ask me.

---

[13] Although Defendant argues that the gap between Sergeant Herbert's first contact with Defendant about the matter and the actual interview is evidence that Defendant did not desire to make a statement, the Court finds instead that Defendant consistently demonstrated a willingness throughout this period to make a statement.

(Govt. Ex. 3D).

Second, Defendant waived his rights "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. As referenced above, Defendant signed the waiver portion of the Advise of Rights form, which provided in relevant part "I do not want a lawyer at this time. I understand and know what I am doing." (Govt. Ex. 3D). Sergeant Herbert read the Advise of Rights form aloud to Defendant while Defendant silently read along on a separate copy, so that the Advise of Rights and waiver portions were presented to Defendant in both oral and written form. In *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2262 (2010), the Supreme Court concluded that there was "more than enough evidence in the record to conclude that [a suspect] . . . understood his *Miranda* rights" when the suspect received a written copy of the Miranda warnings; the Detective determined the suspect could read and understand English;[14] and the suspect was permitted to read the rights while the Detective read them aloud. *Id.* at 2262. Additionally, here, Defendant signed immediately underneath the statement that he understood and knew what he was doing. (Govt. Ex. 3D). This understanding which Defendant acknowledged both in writing and orally necessarily included the advice given to him that "[a]nything you say can be used against you in court, or other proceedings." (Govt. Ex. 3H). Finally, the fact that Defendant declined to waive his rights after the February 25, 2011 arrest, but chose to waive those rights on June 18, 2011, indicates that he "was familiar with these rights, having been [previously] involved with the justice system . . . ." *Pruden*, 398 F.3d at 246.

---

[14] In the Narrative Statement transcribed by Sergeant Herbert and signed by Defendant, Defendant affirmatively answered that he reads and writes English. (Govt. Ex. 3D).

Considering that Defendant waived his rights in the absence of "intimidation, coercion or deception," and with the "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," the Court concludes that the circumstances surrounding Defendant's interview "reveal both an uncoerced choice and the requisite level of comprehension." *Moran*, 475 U.S. at 421. Accordingly, even assuming that Defendant was in custody, the Court finds that Defendant effectively waived his *Miranda* rights on June 18, 2011.

### 3. Application of *Edwards*

Defendant claims that under *Edwards v. Arizona*, his right to counsel was violated notwithstanding that he waived the right to counsel during his June 18, 2011 interview, because that waiver was invalid due to his previous invocation of the Fifth Amendment right. This argument also fails.

In *Edwards*, the Supreme Court stated:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484-85. The rationale underlying the *Edwards* rule is that when a suspect indicates that he does not desire to undergo a custodial interview without his counsel, his subsequent waiver would flow from the coercive pressures rather than his voluntary choice. *Arizona v. Roberson*, 486 U.S. 675, 681 (1988). Importantly, the *Edwards* rule, which is intended to prevent police from badgering a defendant into waiving his previously asserted rights, applies only in custodial contexts. *Montejo v. Louisiana*, 129

S. Ct. 2074, 2090 (2009) ("[T]he *Miranda-Edwards* regime . . . applies only in the context of custodial interrogation. If the defendant is not in custody then these decisions [*Miranda* and *Edwards*] do not apply."). As the Court has concluded above, Defendant was not in custody during the June 18, 2011 interview. Accordingly, the *Edwards* rule is not applicable here.

Even if the June 18, 2011 interview were deemed custodial, the *Edwards* rule still would not apply here. The *Edwards* rule was created in a context—unlike here—where an incarcerated defendant invoked his right to counsel, then was interrogated without counsel the next morning, regarding the same charges and while still in custody. *Edwards*, 451 U.S. at 478.

Here, Defendant invoked his right to counsel in connection with his arrest on February 25, 2011. The order dismissing the charges against Defendant was entered on May 27, 2011, (12/22 Tr. at 21:19-21) (Testimony of Attorney Valesquez), Defendant was released from custody on June 1, 2011, (Govt. Ex. 3J), and Defendant provided his statement to Sergeant Herbert on June 18, 2011. The Supreme Court in *Maryland v. Shatzer* limited the application of the *Edwards* rule by concluding that once a suspect has been out of custody for fourteen days, the *Edwards* rule is no longer applicable. *Maryland v. Shatzer*, 130 S. Ct. at 1222. ("Confessions obtained after a 2-week break in custody and a waiver of Miranda rights are most unlikely to be compelled, and hence are unreasonably excluded."). In *Shatzer*, the Supreme Court explained that *Edwards* was designed to ward off the coercive pressures of police interrogation, and concluded that those concerns of intimidation are lessened when a suspect has been out of custody for fourteen days:

> When . . . a suspect has been released from his pretrial custody and has
> returned to his normal life for some time before the later attempted
> interrogation, there is little reason to think his change of heart regarding
> interrogation without counsel has been coerced. He has no longer been
> isolated. He has likely been able to seek advice from an attorney, family
> members, and friends. And he knows from his earlier experience that he
> need only demand counsel to bring the interrogation to a halt; and that
> investigative custody does not last indefinitely. In these circumstances, it
> is far fetched to think that a police officer's asking the suspect whether he
> would like to waive his Miranda rights will any more "wear down the
> accused" than did the first such request at the original attempted
> interrogation—which is of course not deemed coercive. His change of
> heart is less likely attributable to "badgering" than it is to the fact that
> further deliberation in familiar surroundings has caused him to believe
> (rightly or wrongly) that cooperating with the investigation is in his
> interest.

*Id.* at 1222-23. Thus, the seventeen-day lapse between Defendant's June 1, 2011 release and his June 18, 2011 interview renders *Edwards* inapplicable.

In sum, the Court finds that the protections of the *Edwards* rule did not extend to Defendant's June 18, 2011 interview—whether or not that interview was custodial—and, accordingly, the Court will not suppress Defendant's statements on this ground.

**B.  The Sixth Amendment**

As embodied in the Sixth Amendment, the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has made clear that the right to counsel attaches only after formal charges are brought against the defendant. *Moran*, 475 U.S. at 431 ("The Sixth Amendment right to counsel does not attach until after the initiation of formal charges."); *United States v. Gouveia*, 467 U.S. 180, 188 (1984) ("the right to counsel does not attach until the initiation of adversary judicial proceedings . . . ."); *Kirby v. Illinois*, 406 U.S. 682, 690 (1972) (explaining that the initiation of "adversary judicial criminal proceedings" may take the form of a "formal

charge, preliminary hearing, indictment, information, or arraignment."). The Sixth Amendment is put into operation "only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the 'intricacies . . . of law,' . . . is needed to assure that the prosecution's case encounters 'the crucible of meaningful adversarial testing.'" *Moran*, 475 U.S. at 430 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

Defendant argues that his Sixth Amendment right to counsel survived the dismissal of the local charges against Defendant on May 27, 2011, and extended to post-dismissal questioning by the police on June 18, 2011. Def.'s Mot. at 11. The Government responds that Defendant's Sixth Amendment right did not attach at the June 18, 2011 interview because the Defendant's Sixth Amendment right did not survive the dismissal of the local charges. Govt. Opp. at 5.

At the evidentiary hearing, Defendant and the United States presented evidence on the practice in the Virgin Islands to determine the boundaries of the Sixth Amendment right to counsel. Defendant relied on testimony from Attorney Washburn that she performed work for Defendant after the dismissal of the case, (12/22 Tr. at 254:23-255:12) (Testimony of Attorney Washburn), and on testimony from Attorney Valesquez, Clerk of the Superior Court of the Virgin Islands, that an attorney who is appointed to represent a defendant may re-open a dismissed case to file a motion for reconsideration of the dismissal. Defendant argues, therefore, that representation of a defendant does not necessarily end with the dismissal of charges. (12/22 Tr. at 20:4-11) (Testimony of Attorney Valesquez).

On the other hand, the Clerk of the Superior Court testified that the Superior Court historically regards the representation of a defendant to end upon dismissal of the case. (12/22 Tr. at 18: 12-19) (Testimony of Venetia Valesquez).[15] The Government argues that this practice of the Superior Court controls the Sixth Amendment inquiry because the Superior Court has the power to appoint an attorney and determine the length of that appointment. (12/23 Tr. at 20:73-79).

In determining when the Sixth Amendment right is extinguished, the Court will consider the various cases interpreting that constitutional right rather than looking to local practice. *See*, *e.g. Marbury v. Madison*, 5 U.S. 137, 176 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Absent a finding of collusion between prosecutorial authorities, as discussed below, numerous courts have concluded that the Sixth Amendment right to counsel is extinguished after the dismissal of charges. *United States v. Noble*, 364 F. App'x 961, 965 (6th Cir. 2010) ("We also find that [defendant's] Sixth Amendment right to counsel was extinguished by the state's

---

[15] Attorney Valesquez also testified that the Order appointing counsel states: "It is ordered that the following member of the bar is hereby appointed to represent the defendant in all matters pertaining to this action in the Superior Court, unless and until removed by order of the Superior Court, and, thereafter, unless and until removed by order of the District Court." (12/22 Tr. at 17:22-18:2). The Clerk further testified that the Superior Court does not have a practice whereby it enters an Order at the end of a case that would terminate counsel's representation of the defendant. (12/22 Tr. at 18:17-19). Attorney Washburn was appointed to represent Defendant against the charges brought in Superior Court relating to the February 25, 2011 arrest. Attorney Washburn testified that she did not receive an Order from the Superior Court dismissing her as Defendant's attorney, but instead received an Order indicating that the case was dismissed. (12/22 Tr. at 258:12-19). She further testified that she has been appointed to represent several criminal defendants and has never received an Order that her appointment was dismissed. (12/22 Tr. at 259:5-8). This is consistent with Attorney Valesquez's testimony that the Superior Court traditionally does not issue orders terminating the representation of defense counsel, but considers that counsel's representation of a defendant ends upon dismissal of the case. (12/22 Tr. at 18: 12-19) (Testimony of Venetia Valesquez).

dismissal of those charges."); *United States v. Toepfer*, 317 F. App'x 857, 860-61 (11th Cir. 2008) (explaining that when charges are dismissed, the right to counsel is extinguished); *United States v. Alvarado*, 440 F.3d 191 (4th Cir. 2006) (finding the Sixth Amendment right to counsel did not survive dismissal of state charges and did not attach to subsequent federal interrogation); *United States v. Mapp*, 170 F.3d 328, 333-34 (2d Cir. 1999) (explaining that absent collusion, the Sixth Amendment right does not survive dismissal of the state claim and does not subsequently attach to federal investigation); *United States v. Barthelho*, 129 F.3d 663, 675 (1st Cir. 1997) (finding that absent collusion, the Sixth Amendment right to counsel is extinguished after dismissal of the case); *United States v. Martinez*, 972 F.2d 1100, 1104-05 (9th Cir. 1992) (explaining that absent collusion, the court is hesitant to extend the doctrine that "once a defendant has been charged, he may not thereafter be interrogated about the subject matter of those charges unless his counsel is present . . . indefinitely into the future after the initial charge is dismissed . . . .").

## A. Collusion

The Court recognizes that the Sixth Amendment right to counsel may survive the dismissal of charges and attach during the period between dismissal and a subsequent filing of charges if there is collusion between prosecutorial authorities to circumvent a defendant's Sixth Amendment right to counsel. *Martinez,* 972 F.2d at 1105 (explaining that when a defendant provided uncounseled, inculpatory statements during the time between dismissal of state charges and filing of federal charges, the Sixth Amendment would be violated if "the dismissal of state charges or the initiation of federal interrogation was a mutual endeavor in anticipation of a federal prosecution."); *see, e.g.,*

*Roberts v. Maine*, 48 F.3d 1287 (1st Cir. 1995) ("Deliberate chicanery by the government intended to subvert an accused's Sixth Amendment rights, by delaying formal charges, may give rise to a right to counsel before charges are brought.").

Defendant claims that local and federal prosecutorial authorities worked in tandem to delay the federal charges and dismiss the local charges against Defendant so that the local police could interview Defendant without counsel to gain incriminating information in preparation for the filing of federal charges. Def.'s Mot. at 11. In particular, Defendant emphasizes that the state and federal investigations were conducted by the same police officer, Sergeant Herbert, and argues that Sergeant Herbert's involvement throughout the local and federal prosecutions is evidence of the collusion between the prosecutorial authorities. *Id*. Defendant further argues that, under these circumstances, Sergeant Herbert's interview of Defendant after his release from custody on the local charges should not have taken place without the presence of counsel. *Id*.; (12/22 Tr. at 222:9-11).

The Government responds that after the decision by the United States Attorney's Office not to seek an indictment of Defendant after the March 14, 2011 federal grand jury proceeding—which was based on a determination that there was insufficient evidence against Defendant[16]—and the decision by the Attorney General to dismiss the local charges—which were dismissed on May 27, 2011,—"neither office expected to file further charges against Defendant . . . ." (Govt. Opp. at 7). The Government further represented that: "Neither government knew nor expected that dismissal [of the local

---

[16] Sergeant Herbert testified that Defendant was not charged in District Court alongside Dwayne Woodrup and Roy Henry because "[w]e couldn't substantiate . . . the extremely limited information [regarding Defendant] at the time." (12/22 Tr. at 186:11-12) (Testimony of Sergeant Herbert).

charges] would trigger voluntary confessions to third parties who would then notify the Government." *Id.* The Government argues that "the accusation of collusion is thus patently false." *Id.* at 8.

The Court finds that there is insufficient evidence to draw the conclusion of prosecutorial collusion that would warrant the extension of Defendant's Sixth Amendment right beyond dismissal of the local charges. No evidence was presented of involvement by federal prosecutors in the decision by local prosecutors to dismiss the local charges against Defendant or of involvement by local prosecutors in the decision by federal prosecutors to investigate and prosecute Defendant on federal charges. *See United States v. Mapp*, 170 F.3d at 334 (concluding no violation of the Sixth Amendment right when the district court found "that the federal and state investigations were conducted independently; that there was no federal involvement in the decision to dismiss the state charges against [Defendant]; and that there was no state involvement in the federal authorities decision to interrogate or charge [Defendant]."). The fact that Sergeant Herbert was the investigator in both the local and federal cases—without more—is an insufficient ground for the Court to conclude that federal and local prosecutors colluded to circumvent Defendant's Sixth Amendment right.

It is undisputed that Sergeant Herbert was involved in the February 25, 2011 arrest and that he later testified before the federal grand jury on March 14, 2011, which resulted in a federal indictment against two other individuals also arrested on February 25, 2011, Dwayne Woodrup and Roy Henry. Purporting to question the federal government's decision not to seek an indictment of Defendant at the same time, Defendant's counsel noted: "There has been nothing put into evidence as to why the

Court should infer that at some point Woodrup—the case against Woodrup and Henry was stronger than the case against Pogson and Felix."(12/23 Tr. at 113:18-21).[17]

Defense counsel then postulated that federal prosecutors delayed indicting Defendant until after the dismissal of local charges so that Sergeant Herbert could interview Defendant without counsel present. In the face of the Government's contention that federal prosecutors determined that they did not have enough evidence to support charges against Defendant until the "unexpected receipt of Defendant's . . . confession," (12/22 Tr. at 186:11-12); (Govt. Opp. at 7),[18] defense counsel's collusion theory is pure speculation that is completely unsupported by the evidence of record. It is a far cry from the showing of a "mutual endeavor in anticipation of a federal prosecution," which is necessary for a finding of collusion. *Martinez*, 972 F.2d at 1105.

By contrast, the Government presents a plausible explanation of the sequence of events that occurred in this case that militates against a finding of collusion. Specifically, on May 21, 2011, local prosecutors filed a motion to dismiss the local charges against Defendant because they could not sustain their burden of proof. (Govt. Ex. 1D). A fax bearing Defendant's name and a transmission date of May 31, 2011—ten days after local prosecutors filed a motion to dismiss the charges against Defendant—was then received in the Office of Attorney Eszart Wynter. This fax outlined Defendant's involvement in

---

[17] Defendant's counsel further argued "because [federal prosecutors] charged Woodrup and Henry [after the March 2011 federal grand jury proceeding] and not Pogson and Felix, does not mean that they never had the intent of charging Pogson and Felix in District Court." (12/23 Tr. at 114:24-115:2).

[18] Sergeant Herbert testified that prior to receiving the confession from Attorney Andrews, there were no plans "at all" to charge Defendant. (12/22 Tr. at 185:17) (Testimony of Sergent Herbert) (*see also supra* note 16).

the events that precipitated the February 25, 2011 arrest. The evidence suggests that on June 1, 2011, Attorney Wynter gave this fax to Attorney Andrews, who in turn provided the incriminating statement to Sergeant Herbert, precipitating Sergeant Herbert's interview with Defendant: "[The documents] came into my possession when Attorney Andrews came to me and presented them to me and indicated to me that he basically received those documents from Attorney Wynter." (12/22 Tr. at 184:24-185:2) (Testimony of Sergeant Herbert).[19]

The Court considers that the events so described are a plausible explanation of how the local charges against Defendant were dismissed and federal charges were later brought against Defendant without collusion by the prosecutorial authorities. While the Court acknowledges that the inculpatory statements could have been written at any time before May 31, 2011, there is no evidence that either Sergeant Herbert or Attorney Andrews was aware or in possession of the statements prior to May 31, 2011. Nor is there

---

[19] The evidence further suggests that Attorney Wynter provided the incriminating fax to Attorney Andrews at the June 1, 2011 District Court proceeding involving Dwayne Woodrup. When Attorney Wynter was asked if, at a Dwayne Woodrup proceeding in District Court, Attorney Wynter walked "from the defense side of the table over to the prosecution side, putting on the prosecution's desk" the faxed letter that bore Defendant's name, Attorney Wynter initially stated "I would doubt it," then later testified "I could see doing that knowing myself." (12/22 Tr. at 83:20-84:4). That Attorney Wynter provided Attorney Andrews with such a letter is further supported by Attorney Wynter's testimony that he gave Attorney Andrews information that he believed would exculpate his client, Dwayne Woodrup. (12/22 Tr. at 82:1-17) ("I [Attorney Wynter] gave you [Attorney Andrews] information relating to the testimony.").

Dwayne Woodrup's proceedings in District Court occurred on May 26, 2011 and June 1, 2011. (12/23 Tr. at 81:15-16). In its Opposition to Defendant's suppression motion, the Government stated that it received Defendant's handwritten letter from Dwayne Woodrup's counsel—Attorney Wynter—on June 1, 2011. (Govt. Opp. at 3). That Attorney Wynter would have given Attorney Andrews the fax on June 1, 2011—rather than May 26, 2011—is further supported by the May 31, 2011 transmission date on the fax to Attorney Wynter.

any evidence that anything other than the "unexpected receipt" of the confession precipitated the federal charges. (12/22 Tr. at 185:14-17) (Testimony of Sergeant Herbert). Accordingly, there is no evidence that the May 21, 2011 motion by the local prosecutors to dismiss the local charges was filed in contemplation of a future federal prosecution.

In sum, Defendant did not show that the dismissal of the local charges was predicated upon a joint plan by local and federal prosecutors to interview Defendant without counsel. Absent evidence that the prosecutorial authorities worked together to circumvent Defendant's Sixth Amendment right to counsel, the Court cannot find that Defendant's Sixth Amendment right to counsel survived dismissal of the local charges. *United States v. Bartelho*, 129 F.3d 663 (finding there was not collusion, and therefore not a Sixth Amendment violation, when the government did not manipulate the timing of the dismissal or filing of the charges); *Cato-Riggs v. Yukins*, 46 F. App'x 821, (6th Cir. 2002) (concluding that, in the absence of prosecutorial collusion to circumvent the defendant's right to counsel, the obtainment of uncounseled statements made after the dismissal of state charges and before filing of federal charges does not run afoul of the Sixth Amendment). Accordingly, the Court finds that, given the absence of evidence indicating that federal and local prosecutors worked together to circumvent Defendant's Sixth Amendment right to counsel, Defendant's Sixth Amendment right expired with the dismissal of his charges in the Superior Court. Therefore, Defendant's interview with Sergeant Herbert on June 18, 2011 did not contravene his Sixth Amendment right to counsel.

### III.    CONCLUSION

For the foregoing reasons, the Court concludes that neither Defendant's Fifth nor Sixth Amendment rights were violated during the June 18, 2011 interview. Accordingly, the Court will deny Defendant's motion to suppress his oral and written statements made on that date. An appropriate Order accompanies this Opinion.

Date: June 8, 2012

_____/s/_____
WILMA A. LEWIS
District Judge